IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>                    Plaintiff,<br><br>          v.<br><br>SPONGELLE LLC,<br><br>                    Defendant. | Civil Action No. 1:23-CV-00079-RAL<br><br>AMENDED COMPLAINT |

## <u>AMENDED COMPLAINT</u>

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendant Spongelle LLC ("Spongelle" or "Defendant"), and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      Murphy is blind[1] and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

2.      As a result of his blindness, Murphy relies on screen access software to access digital content, like a text message, an email, a website, or a mobile application.

3.      Defendant is a retailer that advertises, offers, and sells personal hygiene goods and related services to the public.

---

[1] Murphy uses the word "blind" to describe individuals who have substantially limited eyesight. This includes individuals who have no vision or who have low vision.

4.      Consumers may access Defendant's goods and services at: physical retail stores that Defendant owns, operates, and/or controls; physical offices that Defendant owns, operates, and/or controls; and/or physical manufacturing facilities that Defendant owns, operates, and/or controls.

5.      Defendant owns, operates, and/or controls a physical retail store at 3333 Bear St #132, Costa Mesa, CA 92626.

6.      Defendant owns, operates, and/or controls physical offices and physical manufacturing facilities at 220 W. Ivy Ave., Suite B, Inglewood, California 90302.

7.      Defendant provides in-person and remote access to its physical retail stores, and provides remote access to its physical offices and physical manufacturing facilities.

8.      To facilitate remote access to all its physical facilities, Defendant employs a website, located at https://spongelle.com/, and a mobile application that is available for download on Apple and Android devices (collectively, the "Digital Platform").

9.      The public may use the Digital Platform to, among other things, purchase goods that are manufactured, stored, and/or shipped directly from Defendant's physical facilities, and access services that are provided at Defendant's physical facilities, such as the services provided by the customer service and shipping teams located at Defendant's physical facilities in California.

10.      This action arises from Defendant's failure to make the Digital Platform compatible with screen access software, thereby denying Murphy full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

11.      Murphy brings this action to ensure full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities going forward.

## JURISDICTION AND VENUE

12.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

13.     Defendant attempts to and does participate in the Commonwealth's economic life by advertising, offering, and selling goods and services from its physical facilities to Pennsylvania residents, including Murphy.[2]

14.     Defendant facilitates these interactions through the Digital Platform, which involves and requires Defendant's knowing and repeated transmission of computer files over the internet into Pennsylvania.

15.     To this end, upon information and belief, Defendant places cookies on computers and other electronic devices physically located in Pennsylvania.[3]

16.     Murphy was injured when he used the Digital Platform from Erie, Pennsylvania to remotely access Defendant's physical facilities, and the goods and services that Defendant offers to the public from its physical facilities.

---

[2] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc*., 298 F. Supp. 3d 296 (D. Mass. 2018) (same).

[3] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 95 n.156 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf (citations omitted) ("A cookie is a message given by a Web server to a computer's Web browser. The primary purpose is to identify users and prepare customized Web pages for them. A persistent cookie is 'a cookie that is stored on a user's hard drive until it expires . . . or until the user deletes the cookie. Persistent cookies are used to collect identifying information about the user, such as Web surfing behavior or user preferences for a specific Web site.'").

17.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

18.     Murphy is a natural person over the age of 18 and is blind.

19.     He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

20.     He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

21.     Murphy has advocated for blind individuals his entire life.[4]

22.     The United States District Court for the Western District of Pennsylvania appointed Murphy as class representative in a class action case substantially similar to this individual action.[5]

23.     Defendant is a Delaware limited liability company with a principal place of business in California.

24.     Defendant is a "public accommodation" within the meaning of Title III of the ADA because Defendant is a "sales establishment" that offers personal hygiene goods and services to the public from physical facilities that Defendant owns, operates, and/or controls, including physical retail stores, physical offices, and physical manufacturing facilities.[6]

---

[4] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.").

[5] *Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, 2020 U.S. Dist. LEXIS 222540, at *9, *34 (W.D. Pa. Nov. 25, 2020), *report and recommendation adopted by* 2021 U.S. Dist. LEXIS 144 (W.D. Pa. Jan. 4, 2021) ("[T]he Court finds that Anthony Hammond Murphy . . . will fairly and adequately represent the class[.]").

[6] 42 U.S.C. § 12181(7)(E).

25.     Defendant's physical facilities are open to the public, as Defendant allows the public to access its physical retail stores in person and remotely through the Digital Platform, and allows the public to access its physical offices and physical manufacturing facilities remotely through the Digital Platform.

## STANDING UP FOR TITLE III OF THE ADA

26.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[7]

27.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[8] and private individuals[9] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[10]

---

[7] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[8] 42 U.S.C. § 12188(b).

[9] 42 U.S.C. § 12188(a).

[10] Johnson, *supra* note 8.

28.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[11] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[12]

29.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[13]

30.     Consistent with these policies, Murphy files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from its physical facilities.

## SUBSTANTIVE ALLEGATIONS

31.     Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities.

32.     Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

33.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer

---

[11] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[12] *Id.* (*quoting Molski v. Evergreen Dynasty Corp*., 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

[13] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[14]

34.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. VoiceOver can now describe people, objects, text, and graphs in greater detail than ever. Auditory descriptions of elements help you easily navigate your screen through a Bluetooth keyboard or simple gestures on a touchscreen or trackpad. And with unique rotor gestures that function like a dial on touchscreens and trackpads, you can make content such as websites a breeze to browse."[15]



35.    The images to the right show a retailer successfully coding its website so that blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.[16]



---

[14] *JAWS®*, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Feb. 21, 2024).

[15] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Feb. 21, 2024).

[16] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

36.     The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

37.     Although invisible to the eye, screen access software reads the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

38.     In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

39.     Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities and the goods and services provided at physical facilities.

40.     Unfortunately, because of Defendant's failure to build the Digital Platform in a way that is compatible with screen access software, Murphy is unable to remotely access Defendant's physical facilities, or the goods and services Defendant provides at its physical facilities.

41.     For example, from visiting the Digital Platform in February 2023, and from investigations performed on his behalf at that time, Murphy found he could not fully and equally access Spongelle's physical facilities in California, or the goods and services provided at those facilities. For example:

        (a)     Spongelle prevented screen reader users, like Murphy, from accessing pricing information about the goods that Spongelle makes available from its physical facilities in California. For example, when consumers visited the Digital Platform from a new IP address, Spongelle displayed a pop-up window inviting them to "GET 25% OFF Your ENTIRE Spongellé Order! Enter your email below to access your exclusive discount code." Consumers who perceived content visually could type their email into the text field that Spongelle provided in the pop-up window, then click "CLAIM MY OFFER" to claim a discounted price for the goods that Spongelle

offered for sale from its physical facilities. Unfortunately, Spongelle did not alert screen readers of this pop-up window. Instead, screen readers remained focused on the content of the Digital Platform's underlying page, making the discount invisible to screen reader users. As a result, Murphy could not have perceived this discount independently, and would have been required to pay more for the goods that Spongelle offered at its physical facilities in California than shoppers who are not blind. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/R2-lo3SIxP8?feature=share.

        (b)      Spongelle prevented screen reader users, like Murphy, from accessing other pricing information as well. Consumers who perceive content visually would have noticed that the Digital Platform lists two prices for many of the goods Spongelle offered for sale at its physical facilities in California. One price—a higher price—appeared in strikethrough font. The other—a lower price—did not. Consumers who perceive content visually would have understood that the price appearing in strikethrough font was the "old" or "original" price, while the price appearing in regular font was the "new" or "sale" price. Unfortunately, unless a website is coded properly, it is impossible for screen readers to identify the meaning of the juxtaposition of these two fonts. To this end, Spongelle announced two prices for the same good, making it difficult for screen reader users to determine with certainty what the prices signified, like different quantities, conditions, sizes, or in this case, sales. This unnecessary confusion made it impossible for screen reader users, like Murphy, to purchase any of the goods that Spongelle offered for sale at its physical facilities in California with confidence in the good's actual price. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/SF_pWQV-xKw?feature=share.

(c)      Spongelle prevented screen reader users, like Murphy, from accessing payment information about the goods that Spongelle made available from its physical facilities in California. Consumers who perceive content visually would have noticed various logos on the Digital Platform identifying the payment methods that Spongelle accepts at its California-based physical facilities, including Visa, Mastercard, Stripe, PayPal, American Express, Amazon Pay, and Discover. Unfortunately, Spongelle failed to ensure that all these logos included sufficiently descriptive alternative text. As a result, Murphy could not have determined whether he could use his preferred method of payment to purchase the goods that Spongelle made available from its physical facilities in California. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/hY3y29cYSg0?feature=share.

(d)      Spongelle prevented screen reader users, like Murphy, from accessing payment services that Spongelle provides from its physical facilities in California. Consumers who perceive content visually would have noticed the bag icon at the bottom of the Digital Platform's screen. This icon would turn pink after a consumer added an item to their shopping cart. This visual cue confirmed the shopper placed a good from Spongelle's physical facilities in California into the shopper's digital shopping cart. Unfortunately, Spongelle failed to notify screen readers, like Murphy, when this visual effect appeared. As a result, Spongelle made it impossible for screen readers users to confirm they placed a good from the shelves within Spongelle's physical facilities in California into their digital shopping carts at the same time that Spongelle communicated this same information to shoppers who are not blind. This uncertainty made it more likely that screen reader users, like Murphy, would abandon the goods from Spongelle's physical facilities in their digital shopping carts before completing a purchase. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/0dNGh0YKu3c?feature=share.

(e)     Spongelle prevented screen reader users, like Murphy, from accessing accessibility services that Spongelle provides from its physical facilities in California because Spongelle had not developed the Digital Platform so that screen readers could activate these services with a screen reader. As a result, it was impossible for screen reader users, like Murphy, to adjust the Digital Platform's settings, which may or may not have helped him access Spongelle's physical facilities and the goods and services Spongelle provides at its physical facilities in California. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/CRi1SyXICMM?feature=share.

42.     Consistent with his interests in determining whether the Digital Platform might become fully and equally accessible to screen reader users, Murphy attempted again to access Spongelle's physical facilities in California and the goods and services provided at Spongelle's physical facilities by visiting the Digital Platform in February 2024. Unfortunately, because of that experience, and from investigations performed on his behalf at that time, Murphy again found he could not fully and equally access Spongelle's physical facilities and the goods and services provided at Spongelle's physical facilities in California. For example:

(a)     Spongelle prevents screen reader users, like Murphy, from accessing any of the goods and services that Spongelle provides at its physical facilities in California when Spongelle's accessibility services are enabled on the Digital Platform. As described above, Spongelle, from its California-based physical facilities, offers an accessibility service, on the Digital Platform, that is supposed to bring a website into compliance with the ADA. Unfortunately, Spongelle has failed to implement this service successfully. To this end, after screen readers enable Spongelle's accessibility service, it becomes impossible for screen readers to access any of the Digital Platform. As a result, the accessibility service that Spongelle offers from its physical

11

facilities actually makes it impossible for Murphy to access Spongelle's physical facilities in California and the goods and services that Spongelle makes available from those physical facilities. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915331805/8455e95333?share=copy.

(b)     Spongelle prevents screen reader users, like Murphy, from accessing various goods and services that Spongelle provides from its physical facilities in California. The Digital Platform features a menu button that consumers may click to view various goods and services that Spongelle provides from its California-based physical facilities, including information about the goods provided at Defendant's physical facilities, like Best Sellers, Gifts, and Sales, as well as the services provided at Defendant's physical facilities, like Order Lookup, Contact, and Store Locator. Defendant displays this information in a pop-up window that consumers may use to access the goods and services Spongelle offers from its nerve center in California. Unfortunately, Spongelle does not alert screen readers when this pop-up window appears. Instead, screen readers remain focused on the content of the Digital Platform's underlying page, making the goods and services provided at Spongelle's physical facilities invisible to screen reader users. As a result, it is impossible for screen reader users, including Murphy, to access the goods and services provided at Spongelle's physical facilities in California through the Digital Platform. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915335363/fbeb06df02?share=copy.

(c)     Spongelle prevents screen reader users, like Murphy, from accessing customer rating information about the goods that Spongelle provides at its physical facilities in California. Spongelle provides a five-star rating for many of the goods that its sells from its California-based physical facilities. Consumers who perceive content visually can see whether a

good has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Spongelle fails to provide sufficiently descriptive alternative text for many of these ratings. As a result, it is impossible for screen reader users, like Murphy, to purchase the goods Spongelle makes available from its physical facilities in California with confidence that the goods are well-received by other consumers. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915330669/90cd2a93ce?share=copy.

       (d)     Spongelle prevents screen reader users, like Murphy, from accessing social and community services that Spongelle provides from its physical facilities in California. Social media icons on the Digital Platform lack alternative text describing their purpose. Consumers who perceive content visually will likely recognize these icons, and understand that by clicking them, Spongelle will redirect consumers to the different social media communities that Spongelle makes available and oversees from its California-based physical facilities. Unfortunately, these icons are not labeled with sufficiently descriptive alternative text. As a result, it is unlikely, or impossible, that screen reader users, like Murphy, will discover the online communities that Spongelle offers from its physical facilities in California. This denial of access contributes to the very sense of isolation and stigma the ADA was intended to eliminate. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915336842/31797c2e11?share=copy.

       (e)     Spongelle prevents screen reader users, like Murphy, from accessing the customer services that Spongelle provides from its physical facilities in California. The Digital Platform features an instant messenger that consumers may use to access Spongelle's customer services, located in Spongelle's physical facilities in California. Spongelle features this customer service resource by displaying the instant messenger button atop the Digital Platform's underlying content at all times. As a result, sighted shoppers can easily and quickly access Spongelle's

customer service, located in Spongelle's physical facilities in California, at any point during their shopping experience. Unfortunately, screen reader users, like Murphy, cannot do the same, because Spongelle has designed the Digital Platform in such a way that screen reader users must tab through the entire Digital Platform before discovering the instant messenger. As a result, it is possible that the consumers who most need this resource never reach Spongelle's customer service, located in Spongelle's physical facilities in California. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915335028/e2109eecb4?share=copy.

(f)      Spongelle prevents screen reader users, like Murphy, from accessing store locator services that Spongelle makes available from its physical facilities in California. The Digital Platform includes a store locator service that Spongelle maintains from its physical facilities in California. Consumers may use this store locator to locate a business that sells Spongelle's goods in-person. Spongelle allows consumers to define their search by location type (*e.g.*, retail, spa, distributor, and hotel) and distance (*e.g.*, 10 miles from a given zip code, city, or address). Unfortunately, screen reader users, like Murphy, cannot use this service fully and equally because Spongelle, from its physical facilities in California, maintains it in such a way that screen readers cannot access the service's filter. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915335935/d9ffab985d?share=copy.

(g)      Spongelle prevents screen reader users, like Murphy, from accessing the customer account services that Spongelle makes available from its physical facilities in California. The Digital Platform allows consumers to create personal accounts to facilitate their shopping experience and gain access to exclusive events, offers, and content that Spongelle makes available from its physical facilities in California. From these same physical facilities in California, Defendant created an online form that consumers may access on the Digital Platform. The form

directs consumers to provide their name and email address, and to create a password for their personal account. Because it is inevitable that, on occasion, consumers will make a mistake in completing an online form, Spongelle provides useful error messages directing consumers to missing or inaccurate information. Unfortunately, screen reader users cannot access these error messages because Spongelle, from its physical facilities in California, maintains the Digital Platform in such a way that screen readers do not perceive the messages. As a result, screen reader users, like Murphy, are less likely to access the customer account services that Spongelle makes available from its physical facilities in California. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915334090/4fb17c6891?share=copy.

    (h)  Spongelle prevents screen reader users, like Murphy, from accessing the payment processing services that Spongelle makes available from its physical facilities in California. The Digital Platform allows consumers to use a mobile application to buy the goods that Spongelle makes available from its physical facilities in California using a payment processing service that Spongelle also makes available from its physical facilities in California. Consumers who perceive content visually will recognize the Digital Platform's shopping bag icon and understand that by clicking it, they will access Spongelle's online payment processor. Unfortunately, this icon is not labeled with sufficiently descriptive alternative text. As a result, when screen readers hover over it, Spongelle announces "button," only. Because this text is meaningless without visually perceiving the context in which it appears, screen reader users, like Murphy, are unlikely (or unable) to access the goods or payment processing services that Spongelle makes available from its physical facilities in California. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/915336530/da11d692ff?share=copy.

43.    The access barriers described above, and others, denied and continue to deny Murphy full and equal access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

44.    These barriers, together with Defendant's insufficient policies and practices giving rise to them, humiliate and deter Murphy from using the Digital Platform in the future to access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

45.    Still, Murphy intends to return to the Digital Platform within the next six months to determine if it is accessible and, if so, to attempt to access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities at that time.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

46.    The assertions contained in the previous paragraphs are incorporated by reference.

47.    Murphy is a person with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

48.    Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E), (F).

49.    Defendant violated the ADA by, among other things, denying Murphy the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations, denying Murphy an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations, providing Murphy an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations, and excluding Murphy, denying him services, and treating him differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices. 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

50.     These violations denied Murphy access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities.

51.     These violations also humiliate Murphy and deter him from attempting to use the Digital Platform to access to Defendant's physical facilities and the goods and services provided at Defendant's physical facilities, thereby forcing Murphy to access Defendant's physical facilities in-person or wait until Defendant elects to retrofit the Digital Platform to be accessible.

## PRAYER FOR RELIEF

WHEREFORE, Murphy requests judgment as follows:

(A)     A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Murphy could use the Digital Platform to fully, equally, and independently access Defendant's physical facilities and the goods and services provided at Defendant's physical facilities;

(B)     A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services provided at Defendant's physical facilities are fully, equally, and independently accessible to Murphy by the Digital Platform, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below;

(1)     Within 90 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the Accessibility Coordination Team for the Digital Platform;

(2)      Within 120 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users.

(3)      Within 150 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy designed to ensure the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users within 18 months of the Court's order.

(4)      Within 180 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant is making efforts to ensure that its Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users, and includes an Accessibility Feedback Form that encourages visitors to provide feedback to help improve the accessibility of the Digital Platform. Defendant shall add a link at the beginning of all Digital Platform's landing pages, directing screen reader users to the Accessibility Statement. Defendant shall have the option to make this link invisible to customers who do not use screen readers.

(5)      Within 210 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are Blind and/or who have a Visual Disability) who encounter difficulties using the Digital Properties and to timely assist such individuals within published hours of operation

(6)      Within 210 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Digital Platform to fail to provide effective communication to screen reader users are remedied with the same level of priority (e.g., speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7)      Within 12 months of the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the future design, development, and maintenance of the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 12 months of the Court's order or 180 days of their hire date. Commencing in 36 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8)      Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. The monthly accessibility audit shall be conducted using the WAVE Web Accessibility Evaluation Tool (https://wave.webaim.org), the enterprise level Pope Tech automated testing tool (https://pope.tech), or similar tool approved by Plaintiff. At minimum, the monthly accessibility audit shall include each home or landing page of

the Digital Platform, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9)     Until furthered ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times per year) basis to evaluate whether the Digital Platform conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Digital Platform, as well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10)    Until furthered ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11)    Defendant shall provide Plaintiff, through his counsel, with a report on the first, second, and third anniversaries of the Court's Order which summarizes the progress Defendant is making in meeting its obligations.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[17]

---

[17] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An order retaining jurisdiction over this case until Defendant has complied with the

Court's orders.

Dated: February 21, 2024                          */s/ Kevin W. Tucker*
                                                  _____

                                                  Lawrence H. Fisher
                                                  Pa. No. 67667
                                                  One Oxford Centre
                                                  301 Grant Street, Suite 270
                                                  Pittsburgh, PA 15219
                                                  Tel. (412) 577-4040
                                                  lawfirst@lawrencefisher.com

                                                  Kevin W. Tucker (He/Him) (PA 312144)
                                                  Kevin J. Abramowicz (He/Him) (PA 320659)
                                                  Chandler Steiger (She/Her) (PA 328891)
                                                  Stephanie Moore (She/Her) (PA 329447)
                                                  EAST END TRIAL GROUP LLC
                                                  6901 Lynn Way, Suite 215
                                                  Pittsburgh, PA 15208
                                                  Tel. (412) 877-5220
                                                  Fax. (412) 626-7101
                                                  ktucker@eastendtrialgroup.com
                                                  kabramowicz@eastendtrialgroup.com
                                                  csteiger@eastendtrialgroup.com
                                                  smoore@eastendtrialgroup.com

                                                  *Attorneys for Plaintiff*

---

F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Feb. 21, 2024) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).